IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ELMA CRUZ,<br><br>         Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>         Defendant. | CASE NO. 1:23-CV-00511-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Elma Cruz challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On March 14, 2023, the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #6). Following review, and for the reasons stated below, I **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings consistent with this decision.

PROCEDURAL BACKGROUND

Ms. Cruz filed for DIB on May 8, 2021, alleging a disability onset date of October 1, 2006. (Tr. 71). After her claim was denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge. (Tr. 71-79, 81-88, 107). Ms. Cruz (represented by counsel) and a vocational expert (VE) testified before the ALJ on May 27, 2022. (Tr. 44-70). At the hearing, Ms. Cruz amended her alleged onset date to January 1, 2021. (Tr. 48).

1

On June 22, 2022, the ALJ found Ms. Cruz not disabled. (Tr. 21-43). On January 9, 2023, the Appeals Council denied Ms. Cruz's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 10-15; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Cruz timely filed this action on March 14, 2023. (ECF #1).

## Factual Background[1]

### I. Administrative Hearing

Ms. Cruz lives with her husband, a schoolteacher. (Tr. 50). She has three children and four grandchildren. (*Id.*). She worked part-time as a retail cashier from 2016 through 2020. (Tr. 52-53, 58). Before that, she provided daycare services from her home. (Tr. 53). Ms. Cruz left her cashier position because she has difficulty walking and trouble completing her job tasks on time. (Tr. 57).

Ms. Cruz cannot work because she is in constant pain. (Tr. 54). She has muscle spasms in her back and difficulty grabbing items with her hands because arthritis has deformed them. (*Id.*). Her ankles and feet are painful and make it difficult to stand all day. (*Id.*). She also suffers from migraines. (Tr. 60). Ms. Cruz takes pain medication. (Tr. 54). She received a cortisone injection in her back that was not helpful. (Tr. 55).

Ms. Cruz estimates she can stand for 30 minutes without a break but must walk around rather than stay still. (Tr. 61). She has difficulty reaching overhead and uses a grabber tool to reach things. (Tr. 62). She trips often but does not fall. (*Id.*).

On a typical day, Ms. Cruz awakens, gets ready, eats breakfast, and picks up her grandson. (*Id.*). Otherwise, she attends church twice a week. (*Id.*). She and her husband share the household

---

[1] Ms. Cruz only raises issues concerning her physical impairments. (*See* ECF #9, PageID 1227 n.4). I therefore limit my summary of the record to that pertinent to her physical impairments; all other arguments are waived.

2

chores. (Tr. 55). She grocery shops, cooks, dusts, and does laundry. (Tr. 55-56). Because her hands are deformed and she drops stuff "all the time"; her husband does the gardening, sweeping, mopping, and dishes. (Tr. 56, 59, 61). When shopping, she struggles to lift a gallon of milk, laundry detergent, and fabric softener. (Tr. 59).

The VE testified that a person of Ms. Cruz's age, education, and work experience, with the functional limitations described in the ALJ's residual functional capacity (RFC) determination, could perform jobs including cleaner, inspector/hand packager, and office helper, all light, unskilled positions. (Tr. 66). If limited to occasional reaching, pushing, and pulling in all directions, the individual could not perform the previously identified positions but could perform as a furniture rental clerk. (Tr. 69). If the individual needed to alternate between sitting and standing at will, the individual could perform as an officer worker but not as a cleaner or inspector/hand packager. (*Id.*). The VE also testified employers do not tolerate missing two or more workdays a month and being off-task 20 percent of the workday. (Tr. 68).

## II.     Personal and Vocational Evidence

Ms. Cruz was 52 years old on her amended alleged onset date and 53 years old at the administrative hearing. (Tr. 48, 71). She has at least a high school education, and previously worked as a part-time cashier and provided daycare services. (Tr. 52-53).

## III.    Relevant Medical Evidence

On March 13, 2018, Ms. Cruz attended a rheumatology consultation. (Tr. 318-25). The rheumatologist did not find evidence indicative of inflammatory arthropathy. (Tr. 323). But the rheumatologist did note hand osteoarthrosis and Herberden's nodes, confirmed as erosive

3

osteoarthrosis on X-rays, and findings of degenerative joint disease/osteoarthritis in the spine, fingers, and toes, foraminal spinal stenosis, and lumbar radiculopathy. (*Id.*).

On June 26, 2018, Ms. Cruz met with Certified Nurse Practitioner Virginia Brugger where she complained of left shoulder pain when lifting, especially at the sternoclavicular joint, with paresthesias down the arm and into the hand and chronic pain from the front of her ankles to the tops of her feet, for which she wears stabilizing wraps. (Tr. 309). Physical examination revealed spasm and tenderness in the left trapezius muscle; tenderness to palpation of the left deltoid, subacromial bursal, and the sternoclavicular joint; positive provocative shoulder testing, including drop arm and Neer Hawkins; and limited ankle flexion without edema, warmth, erythema, or laxity. (Tr. 309-10). NP Brugger ordered shoulder and ankle X-rays, prescribed a muscle relaxant, and referred Ms. Cruz to physical therapy and consultation with a podiatrist. (Tr. 308).

On August 7, 2018, Ms. Cruz consulted with spinal surgeon Douglas Orr, M.D., who reviewed imaging and noted complete collapse at L5-S1 with significant foraminal stenosis. (Tr. 300). Physical examination revealed decreased lumbar extension due to pain, antalgic gait, and a positive straight leg raise test on the left. (Tr. 302). Dr. Orr suggested a transforaminal epidural injection. (Tr. 303).

On September 25, 2018, Ms. Cruz met with Tanya Johnson, D.P.M, for evaluation of her feet. (Tr. 292-96). Physical examination revealed a non-antalgic gait, decreased ankle joint dorsiflexion, occasional clicking in the left ankle with motion testing, diffuse pain on palpation with the most pain located at the sinus tarsi, and positive bony prominence at the midfoot bilaterally. (Tr. 294). Ankle X-rays from July revealed positive midfoot exostosis at the tarso-

4

metatarsal joint. (Tr. 295). Dr. Johnson educated Ms. Cruz on footgear suitable for standing for long hours. (Tr. 295-96).

On October 16, 2018, Ms. Cruz saw NP Brugger and reported continued ankle and back pain. (Tr. 290-91).

On October 30, 2018, Ms. Cruz saw Dr. Johnson and complained of continued foot and ankle pain, the severity of which varied daily. (Tr. 288). Physical examination revealed a non-antalgic gait with continued pain on palpation of the sinus tarsi and ankle mortise, and pain with passive and resisted range of motion testing in all four directions. (*Id.*). Ms. Cruz received cortisone injections and a brace for her left ankle. (Tr. 287-88).

On September 29, 2020, Ms. Cruz sought treatment for chronic headaches. (Tr. 570). She described initial left frontal pain and pressure that radiates to the back of the neck. (*Id.*). The pain waxes and wanes, increasing over several days and then improving. (*Id.*). She described associated dizziness and nausea but denied vision changes, facial or extremity weakness, and fever. (*Id.*). Ms. Cruz also endorsed muscle spasms in her neck, back, and legs, and pain in her hands, back, feet, and shoulders. (*Id.*). Dr. Brugger noted Ms. Cruz appeared uncomfortable. (Tr. 571). Physical examination revealed normal cervical range of motion, tenderness to palpation across the temporal, parietal, and occipital regions, and at the left temporalis muscle, paracervical musculature, and trapezius. (Tr. 571-72). Ms. Cruz had difficulty with tandem gait and fine motor examination. (Tr. 572). NP Brugger advised Ms. Cruz to stop taking Relafen, prescribed a muscle relaxant, and ordered X-rays and a brain MRI. (Tr. 568-69).

The brain MRI was normal. (Tr. 520-21). Cervical X-ray showed mildly decreased vertebral body height at C5-C6 and multilevel degenerative changes with endplate osteophytes, disc space

narrowing described as moderate to severe at C5-C6 and mild at C6-C7, and multilevel neural foramen narrowing from C4-C5 to C6-C7. (Tr. 522-23).

On October 12, 2020, Ms. Cruz met with neurologist Norman Sese, M.D., regarding her headaches. (Tr. 636-40). She described associated photophobia, throbbing, and severe pain daily. (Tr. 637). Physical and neurological examinations were normal. (Tr. 639-40). Dr. Sese prescribed amitriptyline. (Tr. 640).

On November 13, 2020, Ms. Cruz saw Certified Nurse Practitioner Molly White for an acute headache. (Tr. 574). She endorsed chronic daily headaches, numbness and tingling in her hands, and poor sleep due to pain. (Tr. 576). On examination, NP White noted Ms. Cruz looked "tired/ill-appearing." (*Id.*). She advised Ms. Cruz to continue taking naproxen, follow up with the neurologist, and engage in physical therapy for her neck. (*Id.*).

On November 17, 2020, Ms. Cruz called off work due to a headache and contacted NP Brugger who advised her to increase amitriptyline to 20 mg and refilled her prescription for Ultracet. (Tr. 629-30).

On December 9, 2020, Ms. Cruz met with Dr. Sese and reported continued headaches and difficulty sleeping. (Tr. 626). Physical examination was normal. (Tr. 628). Dr. Sese increased her prescription for amitriptyline and prescribed Imitrex. (Tr. 626).

On March 9, 2021, Ms. Cruz returned to Dr. Sese and reported the increased dose of amitriptyline helped her headaches, through she continued to complain of intermittent headaches described as "sore." (Tr. 598). Physical examination revealed full power and normal tone of the arms and legs, intact sensation, and symmetric reflexes. (Tr. 600). Ms. Cruz rose from the chair without help and had a normal gait pattern. (*Id.*).

On May 12, 2021, Ms. Cruz met with Certified Nurse Practitioner Jamie Kirby and complained of left arm numbness and weakness lasting one week. (Tr. 580). She reported a history of neck and left shoulder pain, osteoarthritis in multiple joints and the low back, foot and finger joint abnormalities, and worsening foot pain. (*Id.*). On physical examination, NP Kirby noted decreased cervical range of motion with pain. (*Id.*). NP Kirby advised her to continue taking gabapentin and referred her to physical therapy to address cervical radiculopathy, left shoulder pain, and headaches. (Tr. 581).

On September 21, 2021, Ms. Cruz met with NP Brugger for left hip pain, described as a constant ache lasting two months, and difficulty sleeping. (Tr. 900). She endorsed brain fog, memory and cognitive issues, and daytime sleepiness. (*Id.*). NP Brugger noted Ms. Cruz's increased dose of gabapentin and amitriptyline contributed to her sleepiness; she reduced the dose of gabapentin and replaced amitriptyline with Topamax for headache prophylaxis. (Tr. 899). For spinal stenosis, NP Brugger referred Ms. Cruz to pain management and ordered lumbar and hip X-rays. (*Id.*).

Lumbar X-rays revealed severe disc height loss at L5-S1, mild facet arthropathy, and mild degenerative changes of the bilateral sacroiliac joints. (Tr. 890). The interpreting physician concluded lumbar spondylosis severe at L5-S1. (Tr. 891). X-ray of the left hip was unremarkable. (Tr. 892-93).

On October 13, 2021, Ms. Cruz met with Girgis E. Girgis, D.O., for a pain management initial evaluation. (Tr. 855). She described low back pain radiating to the legs and toes that is aggravated by sitting, standing, and walking. (*Id.*). Gabapentin, Relafen, and stretches offer little relief. (*Id.*). On physical examination, Dr. Girgis noted bilateral lumbar facet tenderness with

7

positive facet loading test, tenderness over the bilateral lumber paraspinal muscles, pain reproduced with extension of the spine, tenderness over the bilateral sacroiliac joints, negative straight leg raise testing, normal reflexes, normal motor strength and tone, intact sensation, and antalgic gait. (Tr. 859). Ms. Cruz could walk on her heels and on her toes. (*Id*.). Dr. Girgis determined the physical examination supported bilateral sacroiliitis and bilateral lumbar facetogenic pain. (Tr. 860). After reviewing prior X-rays and MRIs, Dr. Girgis determined Ms. Cruz had sacroiliitis, lumbosacral spondylosis without myelopathy, left lumbosacral radiculopathy, and lumbar degenerative disc disease. (Tr. 861). Dr. Girgis scheduled Ms. Cruz for bilateral sacroiliac joint injections. (*Id*.).

On November 3, 2021, Dr. Girgis performed the joint injections. (Tr. 975-76). During recovery from the procedure, Ms. Cruz denied numbness and tingling, and foot push/pull testing showed equal and strong responses. (Tr. 977). She was discharged in stable condition after standing and ambulating with a strong, steady gait. (*Id*.).

On November 23, 2021, Ms. Cruz met with NP Brugger and reported the sacroiliac injections did not help. (Tr. 943). She described recently falling onto the sofa after her left leg would not move and endorsed left neck and shoulder pain since then. (*Id*.). NP Brugger noted Ms. Cruz did not start Topamax when she prescribed it in September; she advised Ms. Cruz to start taking Topamax and ordered vestibular rehabilitation therapy for disequilibrium and cervicogenic headaches, advised her to schedule the sleep study, and directed her to contact pain management for back pain. (Tr. 942).

On January 25, 2022, Ms. Cruz met with NP Brugger and complained of dizziness and knee, back, and ankle pain. (Tr. 1084). NP Brugger reminded Ms. Cruz to schedule vestibular rehabilitation therapy and a polysomnogram. (*Id.*).

On April 26, 2022, Ms. Cruz saw NP Brugger for a blood pressure check and to request refills. (Tr. 1180). There, she complained of chronic pain in her feet, ankles, and hips, and chronic headaches. (*Id.*). NP Brugger also noted hand arthritis. (Tr. 1175). She ordered X-rays and referred Ms. Cruz to a podiatrist. (Tr. 1168). Bilateral foot X-rays revealed moderate narrowing of the interphalangeal articulations of the bilateral feet, slight valgus deformities with inward rotation, midfoot osteoarthritic beaking, and mild flattening of the arch. (Tr. 1169). The interpreting physician concluded moderate osteoarthritic changes in the digits and the midfoot. (*Id.*). Ankle X-rays also showed midfoot arthrosis. (Tr. 1173). Bilateral hand and wrist X-rays showed advanced narrowing in the distal interphalangeal articulations of the hands with subchondral sclerosis and large osteophytes. (Tr. 1171). The interpreting physician concluded advanced routine osteoarthrosis/erosive osteoarthrosis of the distal digits. (*Id.*).

IV. **Medical Opinions**

On July 13, 2021, State agency reviewing physician Rohini Mendonca, M.D., reviewed Ms. Cruz's medical records from January 2018 to May 2021 and determined she can lift and carry 20 pounds occasionally, 10 pounds frequently; frequently push and pull with the bilateral upper extremities; stand and/or walk and sit for about 6 hours each in an 8-hour workday; occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; frequently reach and handle (gross manipulation) with the bilateral upper

9

extremities; and avoid concentrated exposure to vibration and hazards including commercial driving, dangerous machinery, and unprotected heights. (Tr. 75-76).

On September 24, 2021, State agency reviewing physician Bradley Lewis, M.D., reviewed updated medical records through July 2021 and affirmed Dr. Mendonca's findings. (Tr. 83-86).

On November 19, 2021, NP Brugger completed a medical source statement regarding Ms. Cruz. (Tr. 917-18). She identified Ms. Cruz's conditions, including severe lumbar spinal stenosis, sacroiliitis, severe fibromyalgia, generalized osteoarthrosis, neurogenic claudication, cervical radiculopathy, and sensorineural hearing loss, and concluded she can lift up to 5 pounds; stand and/or walk for 1 to 2 hours, 30 minutes without interruption; sit for 4 to 6 hours, 30 minutes without interruption; never climb, stoop, crouch, crawl; occasionally balance; never push and pull; occasionally reach and perform fine manipulation; and frequently perform gross manipulation. (*Id.*). NP Brugger determined Ms. Cruz must be restricted from heights, moving, machinery, temperature extremes, pulmonary irritants, and noise and must be able to alternate between sitting, standing, and walking at will. (Tr. 918). She also stated Ms. Cruz suffers severe pain that interferes with concentration, takes her off task, and causes absenteeism. (*Id.*).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows the five-step evaluation process found at 20 C.F.R. § 404.1520 to determine if a claimant is disabled:

10

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. At Step Five, the burden shifts to the Commissioner to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

The ALJ issued an unfavorable decision on June 22, 2022. (Tr. 21-43). At Step One, the ALJ determined Ms. Cruz meets the insured status requirements of the Social Security Act through December 31, 2025 and has not engaged in substantial gainful activity since January 1, 2021, the amended alleged onset date. (Tr. 27). At Step Two, he determined Ms. Cruz has severe impairments of degenerative disc disease of the cervical and lumbar spine with radiculopathy; fibromyalgia; and osteoarthritis of the hands with Herberden nodes. (*Id.*). The ALJ determined hepatic steatosis, hypertension, headaches, and foot osteoarthritis are not severe impairments. (Tr.

11

27-28). At Step Three, the ALJ determined Ms. Cruz does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (Tr. 28). The ALJ reviewed Ms. Cruz's medical records, hearing testimony, and medical opinions and concluded she has an RFC capable of light work with additional limitations including:

> frequently handling items and reaching in all directions bilaterally; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; frequently work around vibration and hazards such as unprotected heights, but cannot work near dangerous moving machinery or engage in commercial driving.

(Tr. 31) (cleaned up). At Step Four, the ALJ determined Ms. Cruz does not have past relevant work. (Tr. 36). At Step Five, the ALJ concluded Ms. Cruz can perform jobs that exist in significant numbers in the national economy, including cleaner, inspector/hand packager, and office helper. (Tr. 37).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence

must be based upon the record taken as a whole." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up). Substantial evidence is not simply some evidence; rather, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.*

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

13

2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at \*6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Ms. Cruz argues the ALJ did not properly evaluate the consistency and supportability of NP Brugger's opinion, and the RFC assessment is not supported by substantial evidence. (ECF #9 at PageID 1233, 1236). The Commissioner claims the ALJ appropriately evaluated NP Brugger's opinion and identified substantial evidence supporting the RFC assessment. (ECF #11 at PageID 1250, 1252). Because the ALJ did not apply the correct legal standards when evaluating Dr. Brugger's opinion and his findings are not supported by substantial evidence, I **REVERSE** the Commissioner's decision. Because the medical opinion evaluation error is dispositive, I decline to address the second alleged error.

In determining the persuasiveness of a medical opinion, "the ALJ evaluates 'the persuasiveness of medical opinions by considering (1) whether they are supported by objective medical evidence, (2) whether they are consistent with other medical sources, (3) the relationship that the source has with the claimant, (4) the source's specialization, and (5) any other relevant factors.'" *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at \*1 (6th Cir. 2022) (quoting *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022)); *see also* 20 C.F.R. § 404.1520c(c). The ALJ must explain how he considered the factors of supportability and consistency but is not required to use the terms in his analysis. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at \*2 (S.D. Ohio Sept. 7, 2021). The ALJ "may, but [is] not required to" explain the

14

remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are equally persuasive. *See* 20 C.F.R. § 404.1520c(b). The ALJ must make the reasons for the supportability and consistency analysis sufficiently clear for subsequent review to determine whether substantial evidence supports the claimant's disability determination. *Id.* I look to the whole document when reviewing the ALJ's decision. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014). "So long as the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements to survive this court's review." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 440 (6th Cir. 2012).

> Here, the ALJ considered NP Brugger's opinion and determined as follows:
>
> I am not persuaded by the opinions of Virginia Brugger, CNP. On November 19, 2021, Ms. Brugger opined that the claimant could only lift up to 5 pounds occasionally, stand/walk for 1 to 2 hours in an 8-hour workday, sit 4 to 6 hours in an 8-hour workday, never push/pull but occasionally reach and perform fine manipulation, and heights, moving machinery, temperature extremes, pulmonary irritants and noise affects her impairments. She also opined that the claimant was prescribed a cane, walker, brace, and TENS unit, would need to alternate between sitting and standing at will due to pain, and her severe pain would interfere with concentration, take her off-task, and cause absenteeism. The evidence does not support these extreme limitations. While the claimant did have antalgic gait, she retained the ability to walk on her heels and toes. This does not support the assertion that the claimant can only stand and walk for 1 to 2 hours. She had normal strength, which also negates the opinion that the claimant can only lift up to 5 pounds. There is also no evidence of the claimant using a cane or walker during any of her appointments. Therefore, I am not persuaded by this opinion.

(Tr. 35-36) (cleaned up) (citations omitted). While the ALJ uses the term "supportable" in his analysis, it is evident he only addressed the consistency factor by pointing to two normal objective clinical findings from Dr. Girgis and noting that other medical records did not show Ms. Cruz used a wheelchair or cane.

> Elsewhere in the decision, the ALJ stated:

15

Review of the medical evidence from before the amended alleged onset date shows complaints of low back pain that radiates down her legs, as well as weakness and issues controlling her leg movements. Physical examination notes show limited range of motion of the cervical spine, pain with overhead reaching, tenderness to palpation of the lumbar spine and antalgic gait. She participated in physical therapy briefly in 2018. An MRI of the claimant's lumbar spine from 2015 showed moderate left foraminal narrowing at L5-S1. An MRI from 2018 showed foraminal stenosis at left L5-S1, slightly increased disc protrusion at L5-S1 with minimal mass effect on the thecal sac, and degenerative endplate changes at L5-S1. An EMG from 2017 also showed chronic L5 and S1 radiculopathy. X-rays of the cervical spine showed multilevel degenerative changes, moderate to severe at C5-C6.

In May 2021, the claimant sought treatment for left arm numbness and weakness. Physical examination notes show pain with movement and decreased range of motion of the cervical spine. She was recommended physical therapy, which she began a week later. Physical therapy notes from July show only minimal limitations in her cervical range of motion. Other evidence shows normal range of motion.

In October, the claimant sought treatment with a pain management specialist. The claimant reported low back pain that radiated down both lower extremities. She described her pain as aching, burning, and pulsating, rating it as a 9 out of 10, with 10 being the most severe. Physical examination notes show tenderness over the bilateral lumbar facets with positive facet loading bilaterally, tenderness to palpation, antalgic gait, and pain with extension of the lumbar spine. However, the examination also showed negative straight leg raising, normal strength, and the ability to walk on her heels and toes. X-rays of the lumbar spine showed severe disc height loss at L5-S1 with mild facet arthropathy and mild degenerative changes of the sacroiliac joints. She was assessed as having sacroiliitis, lumbosacral spondylosis without myelopathy, left lumbosacral radiculopathy and degenerative disc disease. She was recommended injections to her lumbar spine for pain management. This procedure was performed on November 3, 2021. Considering the objective medical evidence, I find that the claimant would be limited in her ability to lift and carry more than 20 pounds, reach, climb, stoop, kneel, crouch, crawl, and work around hazards.

* * *

Review of the medical evidence from before the amended alleged onset date shows that the claimant complained of pain in her ankles, feet, temporalis muscle, and upper trapezius muscles. Physical examination notes show pain with motion of her ankles. Evidence from September 2021 shows that the claimant was experiencing left hip pain. She complained of brain fog, memory and cognitive issues, and intermittent dull pain throughout. She was referred to a pain management specialist for further treatment. Four months later, the claimant returned to treatment for another ailment but complained of pain in her knees and ankles. She had recently

16

recovered from COVID-19 and was reporting fatigue, cognitive issues, and generalized pain. It is unclear from the record what treatment she received for these symptoms at this appointment. In April 2021, the claimant complained of pain in her bilateral feet, ankles, and hips. Considering this evidence, I find that the claimant would be limited in her ability to work around vibration and hazards.

As for the claimant's hands, imaging shows advanced osteoarthritis in her bilateral hands. Ordinarily, there needs to be evidence of a condition for 12 months for this condition to be considered severe under the Social Security guidelines, but in light of the findings of advanced arthritis I find that this would likely cause more than minimal limitations in her ability to do work-related tasks. Specifically, the arthritis would cause problems handling.

* * *

Based on the foregoing, I find the claimant has the above residual functional capacity assessment, which is supported by medical imaging and physical examination notes showing tenderness to palpation and pain with motion. However, evidence that the claimant retained the ability to walk on her heels and toes, had negative straight leg raising, and normal strength, suggest that she may not be as limited as she purports.

(Tr. 33-36) (cleaned up) (citations omitted).

The remainder of the ALJ's decision notes one additional normal clinical finding – negative straight leg raise testing. The medical records indicate several low back impairments, including stenosis, lumbosacral spondylosis, lumbosacral radiculopathy, and bilateral sacroiliitis.[2] The ALJ relies on Ms. Cruz's ability to walk on her heels and her toes and normal muscle strength

---

[2] Stenosis refers to the narrowing of the vertebral canal, lateral recesses, or vertebral foramina through which the spinal nerves pass. The narrowing may impinge on the spinal cord, cauda equina, or spinal nerves. 7 Bruce Freeman, *et al.*, *Attorneys Medical Advisor* § 71:143 (2023).

Spondylosis refers to intervertebral disc degeneration that may lead to narrowing of the disc space, formation of osteophytes, and various changes to surrounding structures. *Id.* at § 71:168.

Radiculopathy refers to dysfunction of a nerve root often caused by compression of the root. Pain, sensory impairment, weakness, or depression of deep tendon reflexes may be noticed in the distribution of nerves derived from the involved nerve root. *Id.* at § 71:3.

Sacroiliitis refers to inflammation of the sacroiliac joint between the hip and the pelvis and is a common feature of arthritis. *Id.* at § 68:1.

to discount Dr. Brugger's opinion and later notes negative straight leg raise testing. But much of that evidence is not relevant to the conclusions the ALJ has drawn. For instance, heel walk and toe walk tests are diagnostic tests useful for determining nerve involvement. If an individual is not able to walk with his toes off the floor, it is significant for foot-drop due to central or peripheral nerve injury. 2 Don J. Tennenhouse, *Attorneys Medical Deskbook* § 18:4 (4th ed. 2023). If an individual is unable to stand and walk on her toes, it is significant for impairment of the first or second sacral nerve roots or disease of the cerebellum. *Id.* It is not clear, and the ALJ has not explained, how briefly walking on heels and toes is inconsistent with a one- to two-hour standing/walking limitation, especially where Ms. Cruz suffers from some back conditions that do not implicate nerve root involvement.

Similarly, the straight leg raise test, also known as the Lasègue test, is positive if the provocative movement produces pain in the sciatic nerve and is significant for compression of the L4-L5 or L5-S1 nerve roots. *Id.* Again, it is not clear, and the ALJ has not explained, how negative straight leg raise testing is inconsistent with conditions that do not implicate nerve root involvement or indicative of an ability to stand and walk for more than one to two hours.

In short, the ALJ did not address supportability and largely relies on objective medical evidence that is not clearly inconsistent with, or relevant to, Dr. Brugger's opinions to find them not persuasive. While the substantial evidence standard is not a high burden to meet and requires deference to the ALJ's conclusions, it is not trivial and does not require a district court to accept the ALJ's unsupported conclusions. Because the ALJ both failed to apply the correct legal standards and his findings are not supported by substantial evidence, I conclude the decision cannot stand.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **REVERSE** the Commissioner's decision denying disability insurance benefits and **REMAND** for additional proceedings.

Dated: January 29, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE